UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RONALD R. PETERSON, not individually, but solely as Chapter 7 Trustee for Lancelot Investors Fund, L.P., | ) ) ) ) |
| Plaintiff, | ) ) Case No. 12-cv-5096 |
| v. | ) ) Judge John W. Darrah ) |
| PYRAMID TRADING LIMITED PARTNERSHIP, *et al.*, | ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are the *Recommendations to the District Court on Defendants' Motion to Dismiss* from the Bankruptcy Court in the Adversary Proceedings No. 10-2087, Bankruptcy Case No. 08-B-28225. On March 2, 2012, the Bankruptcy Court (J. Cox) issued a memorandum opinion, granting Defendants' Motion to Dismiss the Trustee's Amended Complaint. After the ruling, by joint stipulation, the parties dismissed Counts I, II, and IV of the Amended Complaint with prejudice.[1] The parties and the Bankruptcy Court then referred the matter to this Court, pursuant to the Supreme Court's decision in *Stern v. Marshall*, 131 S.Ct. 2594 (2011), for final judgment as to whether the Trustee's Count III Unjust Enrichment Claim should be dismissed. The matter has been fully briefed and is ripe for ruling.

---

[1] Ronald R. Peterson, as Chapter 7 Trustee, also voluntarily dismissed all claims against Daniel Asher. Furthermore, the Trustee does not object to the Bankrutpcy Court's recommended dismissal of the unjust enrichment claim asserted by Colossus Capital Fund, L.P. and Colossus Capital Fund, Ltd.

**BACKGROUND**

Ronald R. Peterson, as Chapter 7 Trustee (the "Trustee"), filed the adversary proceedings in this matter against Defendants, Pyramid Trading Limited Partnership, Equitec Group, LLC, Dansu, Inc., and Daniel Asher, on behalf of five debtor hedge funds: Lancelot Investors Fund, L.P.; Lancelot Investors Fund II, L.P.; and Lancelot Investors Fund, Ltd. (the "Lancelot Debtors"); and Colossus Capital Fund, L.P. and Colossus Capital Fund, Ltd. (the "Colossus Debtors") (collectively, the "Debtors").[2] The Trustee sought to avoid $12,566,422 in twenty-five alleged constructive fraudulent pre-petition transfers ("Transfers") made by the Debtors to Defendants and also asserted a state law claim for unjust enrichment. (Compl. ¶ 1.)

The following relevant facts are taken from the Trustee's Amended Complaint, which must be taken as true for purposes of the Motion to Dismiss. The Debtors consist of nineteen related entities engaged in the operation of related hedge funds or special purpose vehicles. As of October 20, 2008 (the "Petition Date"), the date on which the Debtors filed for relief under Chapter 7 of the Bankruptcy Code, the Debtors collectively held assets listed on their books and records as approximately $1.8 billion. (Compl. ¶ 8.) However, as discussed in further detail below, the bulk of those assets are virtually worthless.

Prior to the Petition Date, Gregory Bell, an Illinois resident, substantially controlled each of the Debtors through two management companies that he established and controlled: Colossus Capital Management, LLC. ("CCM") and Granite Investment Management, LLC, later known as Lancelot Investment Management, L.P. ("LIM") (together with CCM, the "Management

---

[2] Although the Trustee does not object to the dismissal of the unjust enrichment claim asserted by the Colossus Debtors, some facts about the Colossus Debtors are included to provide context.

2

Companies"). (Compl. ¶¶ 4, 14.) Under applicable limited partnership and other agreements, Bell had the authority to make day-to-day decisions on behalf of the Debtors. (Compl. ¶ 14.) Bell managed Lancelot I and Lancelot II through LIM, which was the General Partner and/or Investment Manager of those Debtors. Similarly, Bell managed Colossus LP through CCM, which was the General Partner and/or Investment Manager of that Fund. (*Id.*)

From 2002 through 2008, Bell and the Management Companies raised hundreds of millions of dollars by selling interests in the Debtors to hundreds of investors throughout the United States and in several foreign countries. The investors in the Debtors included individuals, retirement plans, individual retirement accounts, trusts, corporations, partnerships, and other hedge funds. (*Id.* at ¶¶ 14-15.)

The bulk of the Debtors' assets consisted of notes (the "Notes") purchased from a special purpose vehicle, Thousand Lakes, LLC ("Thousand Lakes"), which was controlled by and affiliated with Thomas J. Petters, a Minnesota resident, and Petters Company, Inc. ("PCI"). The Notes were purportedly secured by certain goods and merchandise owned by Thousand Lakes and/or certain affiliated vendors, Enchanted Family Buying Company ("Enchanted") or Nationwide International Resources ("NIR") and/or certain receivables purportedly due from major retail chains. (Compl. ¶ 8.) However, those Notes were, and are, virtually worthless. (*Id.* at ¶18.)

*The Petters Scheme*

Beginning in 1995, Petters and certain of the Petters Entities began raising money by offering and selling Notes. Petters sold the Notes to various feeder funds, which, in turn, raised investment capital from hundreds of private investors. (*Id.* at ¶¶ 22-23.) The Notes were issued by Thousand Lakes to finance the purchase of consumer electronics and other goods by retailers,

3

such as Costco, Sam's Club, Boscov's, and B.J.'s (the "Retailers"). (*Id.* at ¶ 25.) It was later discovered that the Notes were issued in connection with a multi-billion dollar Ponzi scheme orchestrated by Petters and his co-conspirators. (*Id.* at ¶ 26.)

In offering and selling Notes, Petters represented to investors and potential investors that the proceeds from the sale of the Notes would be used to finance "purchase order financing" transactions. Purchase order financing allows manufacturers or vendors of goods to obtain immediate payment for goods that have been pre-sold to creditworthy retailers. Under Petters's version of purchase order financing, the Petters Entities arranged for· the sale and delivery of end runs or overstocked consumer electronics from manufacturers and then resold the goods to the Retailers. (*Id.* at ¶¶ 27-28.)

For each transaction, Petters and his co-conspirators provided a series of documents to their investors. The documents included a funding request from PCI or its affiliates, executed note documents reflecting the investment and a guaranteed rate of return, purported purchase orders from a Retailer, purported bills of sale from manufacturers to the vendors, and documents assigning a security interest in the underlying merchandise to the financing investors. However, the entire "purchase order financing" business was a multi-billion dollar Ponzi scheme. There were no goods, no bills, and no purchase orders. Instead, Petters and his affiliates created fictitious invoices, purchase orders, and other documents, and used the money they received from investors to make disbursements and other payments to other investors and to enrich themselves. (*Id.* at ¶¶ 31-33.)

As a result of Petters's Ponzi scheme, the goods and merchandise in which the Debtors purportedly held a perfected security interest never existed and the purchase orders provided to

4

Bell and the Debtors were forgeries. Accordingly, the Notes held by the Debtors were virtually worthless. (*Id.* at ¶ 36.)

*Bell's Involvement in 2008*

In December of 2007, Petters told Bell that Costco was late in paying its outstanding invoices, and an agreement was reached between Petters and Bell to extend the term on the Notes from 180 days to 270 days. In January of 2008, Petters told Bell that Costco would be very late in paying the outstanding invoices. Petters suggested that Bell exchange collateral with Petters and replace the Costco invoices with "good collateral" in the form of invoices from other Retailers that would be paid in ninety days. (*Id.* at ¶¶ 44-45.)

Beginning on or about February 26, 2008, Bell and Petters created a series of "round trip" transactions in which Bell wired money to Petters to invest in new Notes secured by purported "good collateral." Petters then wired the money back to Bell to pay off delinquent Notes secured by "bad collateral." These transactions typically occurred within twenty-four hours, and the purpose and effect was to conceal from the Debtors' investors the fact that Thousand Lakes was delinquent in payments to the Debtors and to give investors the false impression that Thousand Lakes was paying off its Notes in a timely manner. (*Id.* at ¶ 46.)

On February 26, 2008, the date upon which Bell and Petters began the "round trip" transactions, the Debtors' assets effectively became a Ponzi scheme and continued as such until the Petition Date. During this time, the Debtors operated at a loss and were not a legitimate on-going business operation. There were no real earnings or profits; the only sources of funding were either the "round-trip" transactions or the investments of new investors. While each of the Debtors held separate operating accounts, the investors' funds were commingled in each of the respective operating accounts. The interest and principal payments made to investors were made

5

on accounts of later investments. Around the time that the Petters Ponzi scheme began to unravel, Bell effectively created a second-level Ponzi scheme in an attempt to keep the Debtors afloat for as long as possible. (*Id.* at ¶ 49.)

On December 1, 2008, a Federal Grand Jury in the District of Minnesota indicted Petters in connection with his operation of the Ponzi scheme. On December 2, 2009, Petters was found guilty of all twenty counts charged in the indictment. He was sentenced to fifty years in prison for his crimes. On September 23, 2009, Bell pled guilty to a single count of wire fraud. On September 30, 2010, he was sentenced to seventy-two months in prison for his fraudulent activity. (*Id.* at ¶¶ 39, 51-52.)

*The Defendants and the Management Fees*

The Defendants were seed investors ("Seed Investors") of the Debtors. The terms of the Seed Investors' investments were outlined in Letter Agreements entered into by the Defendants, CCM, and LIM. (*Id.* at ¶ 53.)[3]

Pursuant to the Lancelot Letter Agreement, Defendants agreed to subscribe for $10,000,000.00 of Interests in Lancelot LP. LIM agreed to pay Defendants 12.5% of the net revenues earned by LIM. The net revenues included management fees ("Management Fees") and performance compensation distributed to LIM from the Debtors. The Lancelot Letter Agreement is among LIM; Ritchie Capital Management, L.L.C. for RTL Options, Ltd.; Defendant Equitec Group, LLC; and Defendant Pyramid Trading Limited Partnership. The Lancelot Debtors are not parties to the Lancelot Letter Agreement. (*Id.* at ¶ 54.)

---

[3] As noted above in footnote 1, the Trustee does not object to the dismissal of the Colossus Debtors' unjust enrichment claim, and, therefore, only the Lancelot Letter Agreement will be considered.

The Seed Investors were not involved in the management of the Debtors; rather, the seed investment of the Defendants was a limited partnership subscription with a particular Debtor. All Management Fees received on account of the Letter Agreements were based upon a calculation of the net revenues of the Debtors, calculations that turned out to be overvalued as they were based upon manufactured Notes and fictitious profits. The Defendants received $12,019,348.00 in Management Fees pursuant to the Lancelot Letter Agreement. The Trustees contends that because the Management Fees were paid on account of the investments of other investors, they should be disgorged. (*Id.* at ¶ 56.)

## LEGAL STANDARD

The parties have stipulated, and the Bankruptcy Court agrees, that, in light of the Supreme Court's decision in *Stern v. Marshall*, 131 S.Ct. 2594 (2011), this Court is the appropriate means by which final judgment on the Trustee's Count III Unjust Enrichment Claim should be entered. Accordingly, the Bankruptcy Court has submitted its proposed findings of facts and conclusions of law pursuant to 28 U.S.C. § 157(c)(1). Section 157(c)(1) provides in relevant part:

> A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under Title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected.

28 U.S.C. § 157(c)(1).

The Federal Rules of Bankruptcy Procedure also provide the applicable standard of review. With respect to hearing non-core proceedings pursuant to 28 U.S.C. § 157(c)(1), Rule 9033(d) provides:

> The district judge shall make a de novo review upon the record, or after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made in accordance to this rule. The district judge may accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions.

Fed. R. Bankr.P. 9033(d). In this case, the Trustee has objected to the Bankruptcy Court's proposed dismissal of its unjust enrichment claim and, therefore, that ruling will be reviewed *de novo* as to whether it states a claim.

**ANALYSIS**

The Bankruptcy Court has recommended that the Court dismiss the Trustee's Count III unjust enrichment claim with prejudice on the basis that the parties had a contractual relationship and that, therefore, the Trustee cannot pursue an unjust enrichment claim. The Trustee argues that the Bankruptcy Court erred in finding that a contract existed between the Lancelot Debtors and Defendants and, consequently, erred in concluding that the Trustee's claim for unjust enrichment asserted on behalf of the Lancelot Debtors could not stand.

Unjust enrichment is an equitable remedy and is only available when there is no adequate remedy at law. *Nesby v. Country Mut. Ins. Co.*, 805 N.E.2d 241, 243 (Ill. App. 2004). Accordingly, "[w]here there is a specific contract that governs the relationship of the parties, the doctrine of unjust enrichment has no application." *Id.*; *see also People ex rel. Hartigan v. E & E Hauling, Inc.*, 607 N.E.2d 165, 177 (Ill. 1992) ("Because unjust enrichment is based on an implied contract, 'where there is a specific contract which governs the relationship of the parties,

8

the doctrine of unjust enrichment has no application.'") (internal citations omitted). Citing to paragraph 14 of the Amended Complaint, the Bankruptcy Court found that the relationship between the Management Companies (LIM and CCM) and the Debtors was governed by "limited partnership and other agreements." Also, citing to paragraph 54 of the Amended Complaint, the Bankruptcy Court found that the Defendants' relationship with the Management Companies was governed by the Letter Agreements, which entitled the Defendants to certain fees under the contracts.

The Trustee does not dispute that an unjust enrichment claim cannot be maintained where an express contract governs the parties' relationship. However, the Trustee contends that no such contract existed between the Lancelot Debtors and the Defendants. Instead, the Trustee contends, the Lancelot Debtors paid Management Fees to the Management Company – and it was the Management Company (LIM) that entered into the Letter Agreement with Defendants to share a percentage of those fees. The Trustee argues that the Bankruptcy Court impermissibly grafted two contracts – the contract between the Lancelot Debtors and the Management Company and the contract between the Management Company and the Defendants – into one to manufacture a contract between the Lancelot Debtors and the Defendants.

In response, Defendants apparently do not contest that there is not a contract between the Lancelot Debtors and Defendants. Instead, Defendants argue, among other things, that the Trustee should pursue a breach of contract action against LIM, and that the Lancelot Debtors were third-party beneficiaries of the Letter Agreement with the Defendants. None of these arguments is persuasive in determining whether the unjust enrichment claim is barred by an express contract.

A careful review of the Amended Complaint's allegations does not support a claim of a contract between the Lancelot Debtors and the Defendants. Rather, the alleged contracts are: (1) contracts between the Lancelot Debtors and the Management Companies (paragraph 14); and (2) the Letter Agreements between the Management Companies and the Defendants (paragraph 54). Consequently, the Bankruptcy Court erred in finding that the Trustee's unjust enrichment claim was barred by contract. *See, e.g., Grede v. de Saint Phalle,* No. 09-cv-2258, 2011 WL 862044, at *3 (Mar. 9, 2011) (holding that unjust enrichment claim survived dismissal where there was no contract alleged between plaintiffs and defendants, even though there were other contracts at issue). The Trustee's unjust enrichment claim should not have been dismissed based on an express contract.

## CONCLUSION

For the foregoing reasons, the Court denies the Defendants' Motion to Dismiss with respect to the Trustee's Count III unjust enrichment claim. For the same reasons, the Court denies the Defendants' Motion to Dismiss with respect to the Trustee's Count III unjust enrichment claim in the related case, *Ronald R. Peterson v. Ritchie Capital Mgmt, LLC et al.*, Case No. 12-cv-5092. The case is remanded to the Bankruptcy Court for proceedings in accordance with this Opinion.

Date:____June 19, 2013_____  _____
JOHN W. DARRAH
United States District Court Judge